**AMERICAN MINING CONGRESS,**
Petitioner,

v.

**Ray F. MARSHALL, Secretary of Labor, U. S. Department of Labor; and United States Department of Labor; and Robert B. Lagather, Assistant Secretary for Mine Safety and Health, U. S. Department of Labor; and Mine Safety and Health Administration, U. S. Department of Labor, Respondents.**

Nos. 80–1581, 80–2166.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 14, 1981.

Decided Feb. 22, 1982.

Anthony J. Thompson of Hamel, Park, McCabe & Saunders, Washington, D. C. (Edward A. McCabe, Raymond D. McMurray, John H. Spellman, and Charles E. Sliter of Hamel, Park, McCabe & Saunders,

Washington, D. C., Frank H. Morison and Jane Michaels Talesnick of Holland & Hart, Denver, Colo., and Henry Chajet, Senior Counsel, American Mining Congress, Washington, D. C., with him on the briefs), for petitioner.

Cynthia L. Attwood, Deputy Associate Sol., Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Moody R. Tidwell, Associate Sol., Edward P. Clair, Counsel for Coal Mine Standards and Regulations, Edward C. Hugler and Ann S. Rosenthal, Attys., U. S. Dept. of Labor, Arlington, Va., with her on the brief), for respondents.

Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges:

McKAY, Circuit Judge.

Petitioner, American Mining Congress, challenges the promulgation of rules by the Secretary of Labor under the Federal Mine Safety and Health Act (MSHA), 30 U.S.C. §§ 801–960 (1976 & Supp. III 1979), on both substantive and procedural grounds.

Congress passed the original Coal Mine Health and Safety Act, 30 U.S.C. §§ 801-960 (1976), in 1969 in response to studies indicating that prolonged exposure of miners to coal dust causes black lung disease. To achieve its purpose of preventing black lung disease, Congress established the following health standard:

> Effective three years after December 30, 1969, each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air.

30 U.S.C. § 842(b)(2). This standard was based upon data developed in Great Britain, using the Mining Research Establishment (MRE) gravimetric area sampling instrument, indicating that the incidence of black lung disease would be 2% at respirable dust

concentrations at or below 2 milligrams per cubic meter of air. S.Rep.No. 91–411, 91st Cong., 1st Sess. 16 (1969). This statutory standard is still in effect and is not challenged here.

Congress also established the basic regulatory framework within which the 2 mg./m$^3$ standard was to be attained:

> Each operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed. Such samples shall be taken by any device approved by the Secretary [of Labor] and the Secretary of Health, Education, and Welfare and in accordance with such methods, at such locations, at such intervals, and in such manners as the Secretaries shall prescribe in the Federal Register within sixty days from December 30, 1969 and from time to time thereafter. Such samples shall be transmitted to the Secretary [of Labor] in a manner established by him, and analyzed and recorded by him in a manner that will assure application of the provisions of section 814(i) of this title when the applicable limit on the concentration of respirable dust required to be maintained under this section is exceeded.

30 U.S.C. § 842(a). The Act was amended and renamed in 1977, but the provisions quoted above were unchanged.

The Secretary first promulgated regulations under the authority of § 842(a) of the Act in 1970. 30 C.F.R. Part 70 (superceded).[1] The 1970 regulations adopted the high-risk occupation sampling approach under which mine operators were required to sample the air breathed by persons in designated high-risk occupations. 30 C.F.R. §§ 70.240-.246 (superceded). This approach was based on studies indicating that the highest concentrations of respirable dust were found in areas where coal was actually being extracted. Thus, the high-risk occupation sampling program required sampling only in the "working sections" of the mine.[2] The rationale of this program

---

[1]. Both the original sampling regulations, which have been superceded, and the new sampling regulations promulgated in the rule being challenged here, can be found in 30 C.F.R. Part 70 (1980). The superceded provisions follow the new provisions. References to the old provisions will be followed by the word "(superceded)."

[2]. "Working section" is defined as "all areas of the coal mine from the loading point of the section to and including the working face."

was that if persons in high-risk occupations were found not to be overexposed to respirable dust, then it could be safely concluded that other miners, in less risky occupations, were protected from excessive concentrations of respirable dust. App., vol. 1, at 72. The high-risk occupation sampling program was never challenged by petitioner.

In April of 1980, the Secretary promulgated a new rule pursuant to the authority of § 842(a) of the Act. 30 C.F.R. Part 70 (1980). It is part of this new rule that is the subject of the instant challenge. The new rule retains the original high-risk occupation sampling program.[3] 30 C.F.R. § 70.-207 (1980). This part of the new rule is not challenged here. However, the new rule goes further by instituting a new "designated area sampling" program in the non-working sections of the mine. Id. § 70.208. This program is based on studies showing that dust generated by sources outby (away from) the working face poses a significant health hazard to miners. App., vol. 1, at 264, 272. Designated area sampling is designed to measure the concentration of respirable dust to which miners are exposed as they work and travel in outby areas. Samples are required to be collected at locations where miners work or travel near known dust generation sources. 30 C.F.R. §§ 70.-208, 70.2(b). The mine operator must designate dust generation sources and placement of sampling devices relative to such sources in a dust control plan, which must be submitted to the Secretary for his approval. Id. §§ 70.2(e), 70.208(e), 75.316, 75.316-

1(b)(2). If designated area samples reveal noncompliance with the statutory standard, corrective action is required to lower the concentration of dust. Id. §§ 70.201(d), 70.-208(d). The overall approach of the designated area sampling program is analogous to that of the high-risk occupation sampling program: if the atmosphere in the area of a known dust generation source is in compliance with the statutory standard, then it can safely be presumed that all miners are protected from overexposure. See Preamble, 45 Fed.Reg. 23,990, 23,998 (Apr. 8, 1980).

Against this background, we now address petitioner's contentions that the designated area sampling regulations are substantively and procedurally defective. Judicial review of the regulations is predicated on § 101(d) of the Act, 30 U.S.C. § 811(d) (Supp. III 1979).

## I. Standard of Review

Petitioner argues on appeal that the Secretary erred (1) in not following the procedures required by the MSHA and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–59, 701–06 (1976 & Supp. IV 1980), (2) in promulgating an arbitrary and capricious rule, and (3) in failing to promulgate [4] provisions necessary to ensure that the rule is not arbitrary and capricious.

The statute conferring the right to judicial review, 30 U.S.C. § 811(d), says nothing about the standard of review. We need not dwell on that issue long, since the parties agree that we must apply the arbitrary and capricious standard of review provided by § 706(2)(A) of the APA.[5] This

---

"Working face" is defined as "any place in a coal mine in which work of extracting coal from its natural deposit in the earth is performed." 30 C.F.R. § 70.2(d), (f) (superceded).

3. The program is renamed as designated occupation sampling. "Designated occupation" is defined as "the occupation ... determined by results of respirable dust samples to have the greatest respirable dust concentration." 30 C.F.R. § 70.2(f) (1980).

4. Under the APA, "agency action" is defined to include "failure to act." 5 U.S.C. § 551(13) (1976).

5. 5 U.S.C. § 706(2)(A). Section 706 provides as follows:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed;· and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, priviiege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

standard applies to all informal rulemaking proceedings such as that prescribed by § 811 of the MSHA. The United States Supreme Court explained the meaning of the arbitrary and capricious standard in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. at 823 (citations omitted). Under this standard, the agency must demonstrate that it considered the relevant factors and alternatives after a full ventilation of the issues and that the choice it made based on that consideration was a reasonable one.[6]

In reviewing the regulations, we must constantly bear in mind that Congress delegated sweeping authority to the Secretary. The statute provides that "samples shall be taken by any device approved by the Secretary ... and in accordance with such methods, at such locations, at such intervals, and in such manners" as the Secretary prescribes. 30 U.S.C. § 842(a). Because Congress has conferred such wide ranging discretion on the Secretary, this court should be hesitant in imposing constraints on his power. The need for judicial restraint is further heightened by the realization that courts do not share the Secretary's expertise in this highly technical area. With these factors in mind, we now proceed to examine petitioner's contentions.

## II. Are the Area Sampling Regulations Arbitrary and Capricious?

### A. Was the Secretary arbitrary and capricious in choosing area sampling over personal sampling?

Petitioner's first argument is that the Secretary's decision to employ area sampling rather than personal sampling to measure compliance with the respirable dust standard is arbitrary and capricious. Under a personal sampling program miners are required to wear face masks containing sampling devices. Petitioner argues that in passing the MSHA Congress was concerned with reducing the level of individual exposure to respirable dust; that the only dust to which an individual miner is exposed is that dust within his breathing zone; and that since area sampling does not sample the air within an individual's breathing zone, it fails to reflect the level of individual exposure and thus fails to achieve Congress' purpose. Apparently petitioner fears that a mine operator might be cited for a violation of the standard on the basis of area samples, even though personal samples show that no one individual's exposure exceeded the standard.

■ We do not think that the Secretary's choice of the area sampling program was arbitrary, capricious, or an abuse of discretion under § 706(2)(A) of the APA. The Secretary received comments from all interested parties. The record is replete with scientific evidence relating to both personal

(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Subsections (E) and (F) do not apply to informal rulemaking. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414–15, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

6. *See National Indus. Sand Ass'n v. Marshall*, 601 F.2d 689, 699–700 (3rd Cir. 1979). We assume for purposes of this decision, without deciding the issue, that when challenged the Secretary has the burden of proving that the rule is not arbitrary and capricious. *See id.* at 700 n.36.

sampling and area sampling. Nothing in the record supports the conclusion that either type of sampling provides a *perfect* measure of exposure to respirable dust. Since there is no perfect sampling method, the Secretary has discretion to adopt any sampling method that approximates exposure with reasonable accuracy. The Secretary is not required to impose an arguably superior sampling method as long as the one he imposes is reasonably calculated to prevent excessive exposure to respirable dust. On this record, the difference between area and personal sampling is not shown to be so great as to make the Secretary's choice of an area sampling program irrational. Keeping in mind that our task is not to determine which method is better, we hold that the Secretary's choice of area sampling over personal sampling is not legally arbitrary and capricious.

We are not unmindful that area sampling may effectively require lower dust levels than might be required under a personal sampling program. This is because an operator might conceivably be cited for a violation of the 2 mg./m$^3$ standard on the basis of area samples even though no individual miner was exposed to more than 2 mg./m$^3$ of respirable dust during a shift. The fact that in theory the regulation may require operators to maintain a dust level below 2 mg./m$^3$ in its person-by-person impact does not render the regulation legally arbitrary and capricious. We repeat that all proposed sampling methods are less than perfect and are designed to provide only estimates of actual exposure. Since measurement error is inherent in all sampling, the very fact that Congress authorized a sampling program indicates that it intended some error to be tolerated in enforcement of the dust standard. The method selected by the Secretary, while perhaps more burdensome in its impact on mine operators than other methods, is not beyond the scope of his discretion.

Petitioner is simply wrong in its contention that Congress expressed a preference for personal sampling over area sampling. Section 842(a) of the MSHA makes clear that Congress left the choice of enforcement methodology entirely within the Secretary's discretion. Petitioner ignores the fact that the British studies relied on by Congress in drafting the 2 mg./m$^3$ standard were based on area sampling conducted with the MRE area sampling instrument.[7] Petitioner also ignores the fact that the designated occupation sampling program is itself an area sampling program.[8] The Secretary could reasonably rely on this lengthy experience with area sampling in adopting an area sampling program for the outby sections of the mine.

The Secretary has demonstrated a rational basis for the designated area sampling program: if the atmosphere in the area of a known dust generation source is in compliance with the statutory standard, then it can safely be assumed that all miners are protected from overexposure to respirable dust. This assumption is justified since no one individual constantly works next to an outby dust generation source over the course of an entire shift.[9]

---

7. Preamble, 45 Fed.Reg. 23,990, 23,994 (Apr. 8, 1980). Indeed, Congress established the MRE device as the instrument of reference for measuring concentrations of respirable dust. 30 U.S.C. § 842(e) (1976).

8. "Designated occupation samples are taken *in the environment* of the occupation . . . that is exposed to the greatest concentration of respirable dust." Preamble, 45 Fed.Reg. 23,990, 23,-991 (Apr. 8, 1980) (emphasis added). *See also id.* at 23,998: "Samples taken at the working face for the high risk occupation . . . also measure the mine atmosphere in locations in the active workings, rather than the exposure of any individual miner for the duration of a shift."

9. Herein lies the answer to petitioner's argument that the area sampling program is invalid because it fails to measure the concentration of dust within an individual's breathing zone. The area sampler does measure the concentration of dust breathed by a hypothetical miner who stands next to the dust generation source for an entire shift. If the air he breathes is found not to exceed the standard, then other miners, who do not stand next to the source all day, are protected precisely because part of their day is spent away from the dust source. This conclusion is logical because area samplers are placed by dust generation sources, areas which are expected to have the highest concentrations of respirable dust. *See* "Strategy for Implementation of the Designated Area Sampling Program" issued by the Mine Safety

The area sampling program has several advantages over a personal sampling program. The most important advantage is that area sampling not only measures the concentration of respirable dust, it allows identification and thus control of dust generation sources.[10] Preamble, 45 Fed.Reg. 23,990, 23,998 (Apr. 8, 1980). Control of dust at the source will obviously contribute to reducing the level of personal exposure. By contrast, the results of personal samples do not allow identification of dust sources due to the movement of miners through various areas of the mine during the course of a working shift. *Id.* Thus, while a personal sampling system makes possible the identification of discrete individuals who have been overexposed, it does nothing to ensure reduction of dust generation because the source of the dust cannot be determined. Therefore, it clearly appears that area sampling can rationally be found to be superior to personal sampling as a means of *enforcing* (as opposed to merely *measuring*) compliance with the 2 mg./m³ standard.

The area sampling program also avoids the greatest problem associated with a personal sampling program—how to achieve miner cooperation. The record contains evidence that many miners strongly dislike wearing personal samplers. App., vol. 1, at 216, 220. Miners also fear that the results of personal samples will be used as evidence against them in compensation proceedings for black lung benefits. *Id.* at 221; vol. 2 at 561, 567–68, 695–96. Finally, there is evidence that the accuracy of samples taken with personal samplers depends on the degree of attention and understanding of the user, factors which are dependent on miner cooperation. *Id.* at 143. The problem of enlisting miner cooperation in any personal sampling program provides further justification for adopting an area sampling approach.

and Health Administration (MSHA) in July, 1980, which provides: "Dust sampling instruments should be positioned within designated areas so that its [sic] measurement is indicative of the highest dust exposure to personnel who are required to work or travel in that area." Addendum to Petitioner's Brief, Ex. F, at 3.

We are convinced on this record that the Secretary has not exceeded his discretion in weighing the many considerations presented to him, and that he has rationally chosen a sampling program that is reasonably calculated to achieve the statutory objective.

**B. Was the Secretary arbitrary and capricious in refusing to reopen the record to consider additional evidence?**

Petitioner argues that the Secretary acted arbitrarily and capriciously in refusing to reopen the record to consider additional evidence after the final rule was promulgated. The new evidence consists of two studies questioning the efficacy of area sampling for purposes of measuring individual exposure to respirable dust.

■■ It is well settled that an agency need not reopen administrative proceedings merely because some new piece of evidence has come to light that was not before the agency at the time it made its decision. This rule was recently reaffirmed by the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978):

> Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed] . . . . If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

*Id.* at 554 55, 98 S.Ct. at 1217, quoting from *I.C.C. v. City of Jersey City*, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420

**10.** Petitioner recognized in its Reply Brief that area sampling "*can be used to monitor sources of dust* and to evaluate the effectiveness of specific ventilation and dust control measures." Petitioner's Reply Brief at 16 n.23 (emphasis added). Unfortunately, this insight was relegated to a footnote in petitioner's brief.

(1944). Were the rule otherwise, the Secretary might still be waiting to promulgate respirable dust regulations, and miners would have no protection at all. We therefore hold that the Secretary's refusal to reopen the record was not arbitrary or capricious.[11]

C. Was the Secretary arbitrary and capricious in failing to relate the definition of respirable dust to a specific sampling device?

Petitioner next argues that the Secretary's refusal to relate the definition of respirable dust to dust particles that are respirable by reference to established sampling devices was arbitrary and capricious. Petitioner contends that the Secretary's definition of respirable dust [12] is deficient in that it does not define respirable dust by reference to objective criteria,[13] thereby leaving the Secretary free to unilaterally change the definition by changing the sampler approval criteria outside the rulemaking process. Petitioner's Brief at 39–41.

While it is true that the Secretary has not defined respirable dust in terms of objective criteria, we note that Congress has not done so either. In 1977, Congress amended the MSHA to define "concentrations of respirable dust" as "the average concentration of respirable dust measured with a device approved by the Secretary ..." 30 U.S.C. § 842(e) (Supp. III 1979). In doing so, Congress deleted the reference to the MRE sampler contained in the original definition.[14] Petitioner suggests that Congress "undoubtedly [deleted the reference to the MRE instrument] to provide [the Mine Safety and Health Administration] with sufficient flexibility to change, through appropriate rulemaking proceedings, the reference point for the definition of respirable dust." Petitioner's Brief at 40 n.24. The fact that the Secretary has flexibility to establish the reference point does not, according to petitioner, relieve him of the duty to incorporate that reference point into the definition he promulgates.

■ We reject petitioner's argument since other provisions of the regulations make clear that the MRE sampler *is* the instrument of reference under the area sampling program. The rule requires that statistics obtained with samplers other than the MRE be converted to their MRE equivalents. 30 C.F.R. § 70.206 (1980). This is accomplished by multiplying by a constant factor prescribed by the Secretary. *Id.* As the Secretary approves new sampling devices, he must establish the conversion factor necessary to convert data from each device to its MRE equivalent. The rule does not state the conversion factor prescribed for the only approved sampler other than the MRE sampler.[15] Reference to the conversion factor was deleted "to allow for entirely different constant factors that may be prescribed for newly developed and ap-

**11.** Petitioner's reliance on *Atchison, T. & S.F. Ry. Co. v. United States,* 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), is misplaced. That case has been restricted to its special facts. *See I.C.C. v. City of Jersey City,* 322 U.S. 503, 515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944).

In any event, these studies are essentially repetitive of other evidence in the record. *See* App., vol. 1, at 327–28, and vol. 2, at 542–43, 544–45, 548–49, 616, 638, 643–44, 659, 721–23.

**12.** The regulations define "respirable dust" as "dust collected with a sampling device approved by the Secretary ... in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title." 30 C.F.R. § 70.2(n) (1980).

**13.** The objective criteria to which petitioner refers are the British Medical Research Council (BMRC) and the Atomic Energy Commission (AEC) criteria. Only dust particles up to 7 microns in size are considered respirable under BMRC standards. Under the AEC definition,

dust particles up to 10 microns are deemed respirable. The MRE sampler follows BMRC criteria while the Bureau of Mines personal sampler follows AEC criteria. These are the two established particle size criteria and sampling devices designed to follow those criteria.

**14.** The 1969 Act defined "concentrations of respirable dust" as "the average concentration of respirable dust if measured with an MRE instrument or such equivalent concentrations if measured with another device approved by the Secretary..." 30 U.S.C. § 842(e) (1976).

**15.** Aside from the MRE sampler, the only approved device is a 10 millimeter cyclone. Preamble, *supra,* at 23,996. The MRE sampler is a four-channel horizontal elutriator. *Id.* The conversion factor from the first to the second is 1.38. *Id.* at 23,997.

proved sampling devices." Preamble, *supra*, at 23,997. Congress and the Secretary have thus encouraged the development of new sampling devices while at the same time requiring conversion to the MRE equivalent. Since Congress did not change the 2 mg./m$^3$ standard in 1977, it is clear that the standard is still based on the British studies conducted with the MRE sampler.[16] In our view, § 70.206 adequately relates the definition of respirable dust to dust particles that are respirable by requiring conversion to the MRE equivalent. We therefore hold that the Secretary was not arbitrary and capricious in failing to refer specifically to the MRE sampler in his definition of respirable dust.[17]

D. Was the Secretary arbitrary and capricious in failing to put the risk of measurement error on miners?

■ Petitioner argues that the rule is arbitrary and capricious because it fails to include a provision recognizing the variability[18] inherent in the sampling process. According to petitioner, the rule allows a citation to be issued to a mine operator who has exceeded the 2 mg./m$^3$ standard by a figure that is within the bounds of probable measurement error. Petitioner apparently wants a provision in the rule allowing enforcement of the respirable dust standard only on the basis of sampling results showing a dust concentration significantly greater than 2 mg./m$^3$.

The Secretary had before him conflicting evidence on the amount of variability in the dust sampling process. App., vol. 1, at 127–91, 192–233, 234–59, 329–75, and vol. 2. at

404-12, 413–20, 424–27. The Secretary did take steps to reduce the potential for variability. The rule provides for multiple shift sampling, that is, using the average of a number of samples taken on consecutive shifts to determine compliance. 30 C.F.R. § 70.207. All compliance determinations are based on the average dust concentration of five samples. *Id.* §§ 70.207(a), .208(c), .210(a)(4). This system minimizes the variability associated with the result of a single sample or several samples taken on a single shift. In addition, the rule requires certification of competence of all people involved in the sampling process, *id.* §§ 70.202, .203; calibration of sampling devices at least every 200 hours, *id.* § 70.-204(b); and examination, testing, and maintenance of devices before each shift, *id.* § 70.204(d). These provisions minimize variability stemming from human and mechanical error.

We do not believe that the Secretary was required to go further in accounting for variability by expressly permitting concentrations of respirable dust in excess of the 2 mg./m$^3$ standard. This would resolve the remaining variability solely in favor of mine operators, to the detriment of the congressional purpose to protect miners from black lung disease. Congress has not mandated any accounting for variability and has given the Secretary broad discretion in enforcing the respirable dust standard. The Secretary has not abused his discretion by refusing to put the risk of the remaining error on miners.

Petitioner admits that over the long run variability will average out. Petitioner's

---

**16.** The Preamble to the rule states:

Congress in the 1969 Coal Act established respirable dust concentrations as measured with an MRE instrument as the standard for evaluating miner exposure to coal mine dust. Congress also recognized the potential for new technology and provided that other approved sampling devices could be used, so long as the concentration of respirable dust measured with such a device was equated to respirable dust concentrations as measured with an MRE instrument. *This concept is not changed under the 1977 Act since the respirable dust standard as set forth in the 1969 Coal Act was carried over without change.*

*Id.* at 23,996 (emphasis added).

**17.** Petitioner's argument that the Secretary might try to change the definition of respirable dust by changing the criteria for sampler approval outside the rulemaking process is not reviewable by this court. Since the Secretary has not tried to do so yet, this contention is obviously premature.

**18.** "Variability" means that for any given set of sampling results showing a concentration of "X" mg./m$^3$, the actual concentration might be any amount within the range of "X" plus or minus an estimated variability factor.

Brief at 61. It is true that on occasion a mine operator will be cited for violating the standard when the actual concentration of dust is below 2 mg./m$^3$. Over the long run, however, there will be just as many occasions on which the operator is not cited when actual dust concentrations are above 2 mg./m$^3$. The Secretary has considered the relevant factors in adopting a sampling program under which the risk of error is shared equally by mine operators and miners. *See* Preamble, *supra*, at 23,997. Having found no "clear error of judgment," *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823, we hold that the Secretary's failure to account for variability by permitting dust concentrations in excess of the statutory standard was not arbitrary and capricious.

E.  Was the Secretary arbitrary and capricious in failing to provide in the rule a procedure for voiding samples containing oversized particles?

Petitioner next contends that the rule is arbitrary and capricious because it does not provide for screening of samples for oversized particles.[19] Petitioner fears that a mine operator may be cited for violating the respirable dust standard on the basis of a sample containing nonrespirable (oversized) particles. Although the Secretary checks all operators' samples containing over 6 mg. of dust for oversized particles,[20] petitioner urges that he must check all samples containing over 1.8 mg. of dust. Petitioner's Brief at 49.

■ Once again petitioner argues that this court should make the Secretary do more than he has already done. In effect, petitioner asks this court to substitute its judgment for that of the Secretary. This we cannot do. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. The MSHA does not make the Secretary the insurer of the accuracy of samples taken by mine operators. On the contrary, the Act requires that "[e]ach operator of a coal mine *shall take accurate* samples" of dust. 30 U.S.C. § 842(a) (1976) (emphasis added). The rule requires that operators adhere to strict procedures in taking and transmitting samples. 30 C.F.R. §§ 70.-202–.204, .207–.209. These procedures benefit the mine operator since their object is to minimize sampling error. The Secretary's procedure for checking samples containing over 6 mg. of dust further benefits mine operators by ensuring that compliance determinations are not based on grossly unrepresentative samples. We hold that the Secretary was not arbitrary and capricious in refusing to go further by requiring that all samples containing over 1.8 mg. of dust be screened for oversized particles.

III.  Are the Area Sampling Regulations Procedurally Invalid?

A.  Did the Secretary comply with the procedural requirements of the MSHA and APA in promulgating the regulations?

Petitioner contends that the Secretary's rulemaking was procedurally defective because (1) documents were not date-stamped as they were received, (2) the index of record omitted some documents in the record and included some documents dated after the close of the comment period, and (3) the reasons for the rule were not adequately stated. Petitioner argues that these deficiencies deprived it of its right to comment granted by the MSHA and the APA,

---

19.  The term "oversized particles" refers to particles of greater size than those that the samplers are designed to collect. In the case of the MRE sampler, it means particles larger than 7 microns; in the case of the Bureau of Mines sampler, it means particles larger than 10 microns. See n.13 *supra*.

20.  MESA (Mining Enforcement and Safety Administration, predecessor of MSHA) Informational Report No. 1045 (1976), App., vol. 1, at 285–87. The report provides in part:

Personnel conducting the weighing operation set aside all samples containing 6 milligrams or more of dust and any questionable samples. These samples are transported to . . . the laboratory . . . for examination . . . . This involves [visually and microscopically] scanning the filter surface for evidence of particles having diameters greater than 10 microns, or for evidence of other contamination . . . . If large particles are present [the sample is invalid].
*Id.*

and made meaningful judicial review impossible. Petitioner's Brief at 11, 12, 14.

█ The MSHA prescribes an informal rulemaking process in rulemaking proceedings under its authority. 30 U.S.C. § 811(a).[21] The procedures necessary in informal rulemaking are set forth in § 553 of the APA. There must be a notice of proposed rulemaking; interested parties must be given an opportunity to participate through submission of written comments; and the final rule must contain a "concise general statement of [its] basis and purpose." 5 U.S.C. § 553(b), (c). There is no requirement of a formal record, oral presentation of arguments, cross-examination, or formal findings and conclusions. There is no requirement that documents be date-stamped as they are received, or that the record be restricted to documents dated prior to the close of the comment period. For this court to impose those requirements would be to disregard the Supreme Court's holding in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). There the Court stated that the "formulation of procedures [beyond those required by the APA is] basically to be left within the discretion of the agencies to which Congress [has] confided the responsibility for substantive judgments." *Id.* at 524, 98 S.Ct. at 1202.

It is true that nine documents[22] (in a record containing hundreds of documents) were not exposed to adversarial comment because they became part of the record after the close of the comment period. These documents consist of background information and data as well as several internal memoranda. There is nothing to indicate that the Secretary actually relied on any of these documents in promulgating the rule or that the data they contain was critical to the formulation of the rule. *See Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 392 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

Nevertheless, petitioner argues its right to comment was denied. Petitioner's Brief at 12. We disagree. It is clear that all interested parties were given a full and fair opportunity to comment on all the significant issues in this rulemaking proceeding. The proposed rule and notice of rulemaking were published in November of 1977. 42 Fed.Reg. 59,294–300 (Nov. 16, 1977). The initial 30–day comment period was extended through February, 1978. 43 Fed.Reg. 979 (Jan. 5, 1978). In June, 1978 the Secretary published a notice of public hearing, listing 53 major issues on which testimony was desired. 43 Fed.Reg. 26,454–56 (June 20, 1978). Hearings were held during the summer of 1978 in Washington, D.C., Pittsburgh, Denver, Charleston and Lexington. Robert Vines represented petitioner at the Lexington hearing. The opportunity for comment afforded to petitioner was more than that required by the APA,[23] and pro-

---

**21.** That section provides:

The Secretary shall by rule in accordance with procedures set forth in this section and in accordance with section 553 of title 5 (without regard to any reference in such section to sections 556 and 557 of such title), develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines. 30 U.S.C. § 811(a) (Supp. III 1979). In addition to the procedures mandated by § 553 of the APA, the MSHA requires the Secretary to hold a public hearing at the request of any interested person. 30 U.S.C. § 811(a)(3) (Supp. III 1979). "Subject to the need to avoid undue delay, the Secretary shall provide . . . the right to present oral statements and to offer written comments and data." *Id.* A transcript of the hearing must be made available to the public. *Id.* There is no requirement of a formal record,

cross-examination, or formal findings and conclusions. Even the right to present oral statements is subordinated to the "need to avoid undue delay." *Id.* These provisions do not change our conclusion that the Act establishes an informal rulemaking procedure.

**22.** The documents can be found at App., vol. 1, at 294–308, 329–75, 376–81, 382–97, and vol. 2, at 424–27, 428–32, 433–34, 533, 724–34.

**23.** The opportunity afforded for comment was also sufficient to satisfy the procedural requirements of § 811(a) of the MSHA. Under that section, the right to comment ends at the close of the comment period. Since there is no requirement of a record, there is of course no requirement that the record be limited to documents dated prior to the close of the comment period.

vided a substantial record on which to review the regulations.

Petitioner has failed to grasp the distinction between the notice of proposed rulemaking and the rulemaking record. It is the former to which the statutory right of comment applies, not the latter. "The [APA] does not require that every bit of background information used by an administrative agency be published for public comment." *B. F. Goodrich Co. v. Department of Transportation*, 541 F.2d 1178, 1184 (6th Cir. 1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 773 (1977). We hold that the Secretary's failure to expose the nine documents to adversarial comment does not invalidate the area sampling regulations.[24]

B. Was the Secretary's "Strategy for Implementation" a rule to which the notice and comment requirement applies?

In July 1980, after promulgation of the final rule, the Mine Safety and Health Administration issued a "Strategy for Implementation of the Designated Area Sampling Program" to mine operators. Addendum to Petitioner's Brief, Ex. F. The "Strategy" consists of a list of potential dust generation sources, guidelines for placement of sampling devices at each source, and suggestions for designating sampling locations in dust control plans. Petitioner contends that the Strategy was a substantive rule and therefore should have been promulgated in accordance with the procedures required by § 553 of the APA and § 811(a) of the MSHA. Petitioner's Brief at 16. The Secretary argues that the Strategy cannot be reviewed by this court under § 811(d) of the MSHA because it is not a "mandatory health or safety standard promulgated under [§ 811]."[25] Respondent's Brief at 38.

We agree with respondent that the Strategy is not a "mandatory health or safety standard" within the meaning of § 811(d) and is therefore not reviewable by this court. *See National Industrial Sand Association v. Marshall*, 601 F.2d 689, 711–12 (3rd Cir. 1979). The designated area sampling rule was the "mandatory health or safety standard"; the Strategy is merely a statement of policy informing mine operators how the Secretary plans to enforce the mandatory standard. The rule itself established only the skeleton of the new sampling program, while the Strategy filled in the details of administration. The rule requires the operator to submit a dust control plan to the Secretary for approval; the Strategy merely sets forth certain features which will, if incorporated in a plan, ensure approval of the plan in most cases. The Strategy is not binding on operators and is not intended to cover all cases.[26] If the Secretary refuses to approve a dust control plan on the ground that the operator has failed to follow the Strategy's guidelines, the operator will receive a citation for failure to have an approved plan. 30 U.S.C. § 814(a) (Supp. III 1979); *see* 30 C.F.R. § 75.316 (1980). The citation can then be contested in an administrative adjudicatory

---

**24.** We also reject petitioner's argument that the Secretary failed to adequately state the reasons for the rule. The Preamble to the rules, 45 Fed.Reg. 23,990–24,000 (Apr. 8, 1980), is more than sufficient to meet § 553's requirement of a statement of "basis and purpose."

**25.** That section provides:

Any person who may be adversely affected by a mandatory health or safety standard promulgated under this section may, at any time prior to the sixtieth day after such standard is promulgated, file a petition challenging the validity of such mandatory standard with the United States Court of Appeals for the District of Columbia Circuit or the circuit wherein such person resides or has his prin-

cipal place of business, for a judicial review of such standard. . . .

30 U.S.C. § 811(d) (Supp. III 1979). The Act defines "mandatory health or safety standard" as "the standards promulgated pursuant to subchapter I of this chapter." *Id.* § 802(*l*).

**26.** The Strategy states:

This package contains basic guidelines that can be used by the District Managers in approval of the operators' dust control plan for "designated areas." The guidelines and examples are not detailed to the extent that all systems and situations are covered; therefore, the District Managers may be flexible in applying the guidelines on a mine-by-mine basis.

Petitioner's Brief, Ex. F, at 1.

proceeding on the ground that the operator's plan will adequately control dust even though it does not conform to the Strategy. 30 U.S.C. § 815 (Supp. III 1979); *see* 30 C.F.R. § 75.316–2 (1980). The Commission's final decision is then subject to judicial review. 30 U.S.C. § 816 (Supp. III 1979). Petitioner's challenge to the Strategy is therefore premature.

■ In any event, it is clear to us that the Strategy is not a rule to which the APA's notice and comment requirement applies. The APA states in pertinent part:

General notice of proposed rulemaking shall be published in the Federal Register . . . . Except when notice or hearing is required by statute, *this subsection does not apply—*

(A) *to* interpretative rules, *general statements of policy,* or rules of agency organization, procedure, or practice . . . .

5 U.S.C. § 553(b)(A) (emphasis added). The "except" clause does not apply here because the MSHA requires notice and hearing only when the Secretary seeks to promulgate "mandatory health or safety standards." 30 U.S.C. § 811(a) (Supp. III 1979).

In *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33 (D.C.Cir. 1974), the court explained the distinction between a substantive rule and a general statement of policy:

A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.* at 38 (footnotes omitted). As we have already explained, the Strategy is not binding on mine operators. Its purpose is to give operators advance notice of the general policy the Secretary intends to follow in approving dust control plans. *See id.* at 40. Operators will have an opportunity to challenge this policy if and when the Secretary refuses to approve a proposed plan. Because the Strategy does not finally affect operators' rights and obligations, we hold that it is a "general statement of policy" exempt from the procedural requirements of § 553. Therefore, the Secretary was not required to afford notice and an opportunity for comment before adopting the Strategy.

### IV. Conclusion

In summary, we hold that the Secretary's Strategy for Implementation is not a substantive rule to which the APA's notice and comment provisions apply. We further hold that the Secretary complied with all the necessary procedural requirements in promulgating the area sampling regulations. Finally, we hold that the area sampling regulations are not arbitrary and capricious. We therefore dismiss the petition for review.