**PHILLIPS PETROLEUM COMPANY, Phillips Oil Company, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 85–1039.**

United States Court of Appeals, Tenth Circuit.

Oct. 10, 1986.

Reese B. Copeland (C.J. Roberts, with him on briefs), Phillips Petroleum Co., Bartlesville, Okl., for petitioners.

John F. Cermak, Jr., Land and Natural Resources Div., U.S. Dept. of Justice and Erik D. Olson, U.S. E.P.A., (F. Henry Ha-

bicht II, Asst. Atty. Gen., U.S. Dept. of Justice, with them on briefs), Washington, D.C. for respondent.

Before HOLLOWAY, Chief Judge, McWILLIAMS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.

Phillips Petroleum Company and Phillips Oil Company ("Phillips"), petition this court to review an Environmental Protection Agency ("EPA") regulation establishing an underground injection control program for the Osage Indian Mineral Reserve in Oklahoma. The underground injection control program regulation was established pursuant to the Safe Drinking Water Act of 1974, Section 1401, 42 U.S.C. §§ 300f–300j–10 (1982) ("SDWA"). Issues raised by Phillips include: (1) whether the SDWA empowers the EPA to promulgate an underground injection control program regulation for the Osage Indian Mineral Reserve; (2) whether the EPA violated the Administrative Procedures Act, 5 U.S.C. §§ 500–576 (1982) ("APA"), by declining to extend the informal rule comment period 30 days; and (3) whether the mechanical integrity requirement of the Osage underground injection control regulation was lawful. The EPA, in turn, challenges this court's jurisdiction to entertain Phillips' petition, asserting that review belongs to the United States Court of Appeals for the District of Columbia.

For the reasons discussed below, we hold that the Osage underground injection control regulation is reviewable in this court. We also hold that the SDWA empowers the EPA to promulgate underground injection control regulations for Indian lands. Phillips' other contentions are without merit, and we therefore uphold the Osage injection program regulation promulgated by the EPA for the Osage Indian Mineral Reserve in its entirety.

I.

INTRODUCTION

A. *The Safe Drinking Water Act.*

The SDWA establishes a regulatory mechanism to insure the quality of publicly supplied drinking water.[1] Part C of the SDWA establishes a regulatory program designed to prevent the endangerment of underground drinking water sources. In particular, Part C envisions a joint federal-state system to regulate the discharge of pollutants by injection wells into underground water systems.[2] The EPA is directed to promulgate regulations establishing the minimum requirements for state underground injection control programs. Section 1421, 42 U.S.C. § 300h.[3] No injec-

---

1. The SDWA is the first federal legislation to specifically address the problem of groundwater pollution.

2. Underground injection is defined by the SDWA to mean the "subsurface emplacement of fluids by well injection." Section 1421(d)(1), 42 U.S.C. § 300h(d)(1). Underground injection is a potentially widespread hazardous waste disposal practice that poses serious threats to groundwater sources of drinking water. Congress was particularly aware of the potential adverse effects of oil and gas related injection. The House Committee on Interstate and Foreign Commerce noted the "[e]nergy production companies are using injection techniques to increase production and dispose of unwanted brines brought to the surface during production.... Part C is intended to deal with all of the foregoing situations insofar as they may endanger underground drinking water sources." H.R.Rep. No. 1185,

93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6454, 6481.

3. Section 1421 of the SDWA, 42 U.S.C. § 300h, provides in part:

(a)(1) The Administrator shall publish proposed regulations for State underground injection control programs within 180 days after December 16, 1974. Within 180 days after publication of such proposed regulations, he shall promulgate such regulations with such modifications as he deems appropriate. Any regulation under this subsection may be amended from time to time.

In requiring the EPA to promulgate minimum requirements for effective state programs to prevent underground injection which endangers drinking water sources, Congress intended to

ratify EPA's policy of deep well injection. (See 39 Fed.Reg. 12922–3, April

**548**

tion is to be allowed that may endanger "drinking water sources." Section 1421(b)(1), 42 U.S.C. § 300h(b)(1). An injection is presumed to endanger drinking water sources if it might result in a public water system's "not complying with any national primary drinking water regulation" or might otherwise adversely affect the public health. Section 1421(d)(2), 42 U.S.C. § 300h(d)(2).

Individual states may apply and receive approval ("primacy") to implement their own underground injection control programs if they meet the minimum requirements established by the EPA's regulations. Section 1422, 42 U.S.C. § 300h–1.[4]

If a state fails to adopt or adequately enforce an approved underground injection control program, the EPA must install its own federally administered program for the state or that part of the state not covered by an EPA approved program. Section 1422(c), 42 U.S.C. § 300h–1(c).

As passed in 1974, the SDWA made no mention of Indian tribes or Indian lands other than to include an "Indian tribal organization" within the definition of "municipality." Section 1401(10), 42 U.S.C. § 300f(10). In 1986, Congress amended Part E of the SDWA by adding section 1451 which specifically authorizes the Administrator of the EPA "to treat Indian tribes as States under this title." Safe Drinking Water Amendments of 1986, Pub.L. No. 99–339, § 302, 100 Stat. 642, 665–66 (1986).[5]

---

19, 1974). This policy was first adopted by the Federal Water Quality Administrator of the Department of the Interior on October 15, 1970. The policy opposes storage or disposal of contaminants by subsurface injection without strict control and clear demonstration that such wastes will not interfere with present or potential subsurface water supplies, contaminate interconnected surface waters or otherwise damage the environment.
Comm. on Interstate and Foreign Commerce, Safe Drinking Water Act, H.R.Rep. No. 1185, 93d Cong., 2d Sess. 29 (1974), U.S. Code Cong. & Admin.News 1974, p. 6481.

4. A State program, in order to be approved:
   (A) shall prohibit, effective on the date on which the applicable underground injection control program takes effect, any underground injection in such State which is not authorized by a permit issued by the State (except that the regulations may permit a State to authorize underground injection by rule);
   (B) shall require (i) in the case of a program which provides for authorization of underground injection by permit, that the applicant for the permit to inject must satisfy the State that the underground injection will not endanger drinking water sources, and (ii) in the case of a program which provides for such an authorization by rule, that no rule may be promulgated which authorizes any underground injection which endangers drinking water sources;
   (C) shall include inspection, monitoring, recordkeeping, and reporting requirements; and
   (D) shall apply (i) as prescribed by § 300j–6(b) of this title, to underground injections by Federal agencies, and (ii) to underground injections by any other person wheth-

er or not occurring on property owned or leased by the United States.
Section 1421(b)(1), 42 U.S.C. § 300h(b)(1).

5. Section 302 of the Safe Drinking Water Amendments states, in relevant part:
   (a) IN GENERAL—Part E of the Safe Drinking Water Act is amended by adding the following new section after section 1450:
   SEC. 1451. INDIAN TRIBES
   (a) IN GENERAL—Subject to the provisions of subsection (b), the Administrator—
   (1) is authorized to treat Indian Tribes as States under this title,
   (2) may delegate to such Tribes primary enforcement responsibility for public water systems and for underground injection control, and
   (3) may provide such Tribes grant and contract assistance to carry out functions provided by this title.
   (b) EPA REGULATIONS—
   (1) SPECIFIC PROVISIONS—The Administrator shall within 18 months after the enactment of the Safe Drinking Water Act Amendments of 1986, promulgate final regulations specifying those provisions of this title for which it is appropriate to treat Indian Tribes as States. Such treatment shall be authorized only if:
   (A) the Indian Tribe is recognized by the Secretary of the Interior and has a governing body carrying out substantial governmental duties and powers;
   (B) the functions to be exercised by the Indian Tribe are within the area of Tribal Jurisdiction; and
   (C) the Indian Tribe is reasonably expected to be capable, in the Administrator's judgment, of carrying out the functions to be exercised in a manner consistent with

Moreover, the 1986 amendments altered section 1422 of the SDWA to clarify the role of the EPA where Indian lands are concerned vis-a-vis powers now permitted to the tribes:

> If an applicable underground injection control program does not exist for an Indian Tribe, the Administrator shall prescribe such a program pursuant to subsection (c) of this section, and consistent with section 1421(b), within 270 days after the enactment of the Safe Drinking Water Act Amendments of 1986, unless an Indian Tribe first obtains approval to assume primary enforcement responsibility for underground injection control.

Pub.L. No. 99–339, § 302, 100 Stat. 666.

An Indian Tribe may assume primary enforcement responsibility for underground injection control consistent with the regulations the Administrator has prescribed pursuant to Part C and Section 1451 of the SDWA. *Id.* However, "[u]ntil an Indian Tribe assumes primary enforcement responsibility, the currently applicable underground injection control program shall continue to apply." *Id.*

## B. *Regulatory Framework and Phillips' Participation.*

In 1980, the EPA promulgated the national technical minimum requirements for all state underground injection control programs. 45 Fed.Reg. 42,472 (June 24, 1980); 45 Fed.Reg. 33,290 (May 19, 1980).[6] Subsequently, the EPA proposed a regulation for promulgating EPA administered underground injection control programs for Indian lands that would satisfy the minimum requirements of section 1421, but also consider tribal preferences and allow maximum uniformity with adjacent state programs. 47 Fed.Reg. 17,578 (Apr. 23, 1982). In 1983, the EPA promulgated a final rule allowing the agency to prescribe "alternate" underground injection control programs for Indian lands. 40 C.F.R. § 144.2 (1985).[7]

On December 2, 1981, the EPA approved Oklahoma's application for underground injection control primacy for the entire state except the Osage Indian Reserve. 46 Fed. Reg. 58,488–89 (Dec. 2, 1981). The State of Oklahoma made no attempt to assert jurisdiction over the Osage Reserve and does not contest the EPA's authority to promulgate the Osage regulation. Thereafter, the EPA began to study and develop an underground injection control program for the Osage Reserve. The EPA held a public hearing on October 14, 1983, outlining the draft Osage and Indian lands underground injection control programs for Oklahoma. 48 Fed.Reg. 40,098–99 (Sept. 2, 1983). On May 11, 1984, the EPA published the proposed underground injection control rule for the Osage Reserve. Public comments were accepted for 45 days. Phillips participated in the public hearing and filed extensive comments, but requested a 30–day extension of the comment period. The EPA denied Phillips' request and the final Osage underground injection control program was adopted on May 11, 1984. 49 Fed.Reg. 20,238 and 20,256–63 (May 11, 1984).

On January 10, 1985, Phillips filed a petition for review of the Osage underground injection control regulation in this court. The next day, Phillips filed an identical petition for review in the United States Court of Appeals for the District of Columbia. That court is holding Phillips' petition in abeyance until we determine whether we

---

the terms and purposes of this title and of all applicable regulations.

**6.** These minimum requirements are now codified at 40 C.F.R. pts 124, 144–46 (1985).

**7.** 40 C.F.R. § 144.2 states:

Notwithstanding the requirements of this part or parts 124 and 146 of this chapter, the Administrator may promulgate an alternative UIC program for Class II wells on any Indian reservation or Indian lands. In promulgating such a program the Administrator shall consider the following factors:

  (a) The interest and preferences of the tribal government having responsibility for the given reservation or Indian lands;

  (b) The consistency between the alternate program and any program in effect in an adjoining district; and

  (c) Such other factors as are necessary to carry out the Safe Drinking Water Act.

have jurisdiction to hear the present case. *Phillips Petroleum Co. v. EPA,* No. 85–1026 (D.C.Cir.1985) (Order of March 11, 1985; modified May 23, 1985). On March 5, 1985, the EPA filed a motion to transfer the case to the United States Court of Appeals for the District of Columbia. By Order dated April 9, 1985, we denied the motion to transfer, but directed the parties to address the jurisdictional issue in their briefs on the merits.

## II.

## JURISDICTION

■ The EPA contends that only the United States Court of Appeals for the District of Columbia may consider Phillips' petition. Phillips responds by arguing that judicial review of its petition falls under another section of the SDWA authorizing review in any appropriate circuit.

Prior to 1986, the SDWA's review provisions read in part as follows:

A petition for review of—

(1) action of the administrator in promulgating ... any regulation for State underground injection control programs under section 300h of this title, or any general regulation for the administration of this subchapter may be filed only in

the United States Court of Appeals for the District of Columbia Circuit; and

(2) action of the administrator in promulgating any other regulation under this subchapter ... may be filed only in the United States Court of appeals for the appropriate circuit.

Section 1448(a), 42 U.S.C. § 300j–7(a).

The 1986 amendments of the SDWA changed the judicial review section with respect to the underground water provisions. The theory for that change is apparently that diversity of review provided by all the circuits is more valuable than developing expertise and uniformity by centralized review in the D.C. Circuit.[8] The judicial review provisions now read as follows:

A petition for review of—

(1) actions pertaining to the establishment of national primary drinking water regulations (including maximum contaminant level goals) may be filed only in the United States Court of Appeals for the District of Columbia Circuit; and

(2) any other action of the Administrator under this Act may be filed in the circuit in which the petitioner resides or transacts business which is directly affected by the action.

**8.** The Senate Report to the 1986 amendments states:

The justification for centralized judicial review of environmental regulations is that it eliminates the possibility of conflicting interpretations of the law in different circuits and allows a single court to develop expertise in this complex area of the law. *However, in the judgment of the Committee these advantages, to the extent they exist, are insufficient to offset the disadvantage of centralized judicial review,* which include inconvenience to litigants who do not reside in Washington, D.C. and an unwarranted concentration of power in a single tribunal, which may in turn generate undesirable political pressures on the appointment of judges. Centralizing review in a single court may also deprive the law of diverse views on complex legal issues, and as a result may make the task of the Supreme Court more difficult. Although other Circuit Courts of Appeal may not at present possess as much technical expertise as the D.C. Circuit, the responsi-

bility of a Court of Appeals is to review regulations for conformity with law, not to undertake technical review of regulations.
S.Rep. No. 99–56, 99th Cong., 2nd Sess. 24 (May 15, 1985).
The Senate bill to which the above cited legislative history applies was subsequently altered by the joint Senate-House Conference Committee. The Senate bill proposed that an application for review of EPA regulations could be filed in either the D.C. Circuit or the court of appeals for the circuit in which the applicant resides or transacts business which is directly affected by such regulation. The Senate bill also proposed a random selection procedure to be administered by the Administrator's Office of the United States Courts to determine the court of appeals in which a regulation was to be reviewed. Although the Conference Committee altered the Senate's proposal in the final draft, we feel that the Senate Committee's language accurately portrays congressional concern over centralized review of the specified EPA regulations under the SDWA.

Pub.L. No. 99–339, § 303, 100 Stat. 667 (amending section 1448 of the SDWA).

Subsection (a)(1) of section 1448 applies to Part B of the SDWA. Phillips' petition relates to Part C which falls under subsection (a)(2) of section 1448 as "any other action of the Administrator" under the SDWA. Therefore, the 1986 amendments give us jurisdiction. The question is whether the newly conferred jurisdiction applies to previously filed but still pending petitions, such as Phillips'. We hold that it does.

The Supreme Court has held that "when a law conferring jurisdiction is repealed without any reservation to pending cases, all cases fall with the law." *Bruner v. United States*, 343 U.S. 112, 116–17, 72 S.Ct. 581, 584–85, 96 L.Ed. 786 (1952); *accord Ex parte McCardle*, 74 U.S. (7 Wall) 506, 19 L.Ed. 264 (1868); *Garrett v. Bamford*, 582 F.2d 810, 817 (3d Cir.1978); *Adams v. Brinegar*, 521 F.2d 129 (7th Cir. 1975); *Koger v. Ball*, 497 F.2d 702 (4th Cir.1974); *De Rodulfa v. United States*, 461 F.2d 1240 (D.C.Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). "Conversely, a statutory expansion of jurisdiction suffices to vest power in federal courts to adjudicate cases which arose prior to enactment of the jurisdictional statute." *Garrett*, 582 F.2d at 817. As the Supreme Court has consistently held, congressional alteration of the subject matter jurisdiction of federal courts results in retroactive application to pending cases. *United States v. Alabama*, 362 U.S. 602,

80 S.Ct. 924, 4 L.Ed.2d 982 (1960); *Bruner*, 343 U.S. at 116–17, 72 S.Ct. at 584–85.

The 1986 SDWA jurisdiction amendment "takes away no substantive right, but simply changes the tribunal that is to hear the case." *Hallowell v. Commons*, 239 U.S. 506, 508, 36 S.Ct. 202, 203, 60 L.Ed. 409 (1916). Indeed, "Congress has not altered the nature or validity of petitioner's rights," *Bruner*, 343 U.S. at 117, 72 S.Ct. at 584–85; *see also*, *McGee v. International Life Insurance Co.*, 355 U.S. 220, 224, 78 S.Ct. 199, 201–02, 2 L.Ed.2d 223 (1957), but has simply withdrawn jurisdiction from the Court of Appeals for the District of Columbia and, in its place, vested jurisdiction over underground injection control programs in the "circuit in which the petitioner resides or transacts business which is directly affected by the action" of the Administrator, Pub.L. No. 99–339, § 303, 100 Stat. 667. Since the statutory changes are purely jurisdictional in nature and do not affect the ultimate availability of relief for the claims at issue, this court is the proper forum to entertain Phillips' petition.[9]

### III.

### APPLICATION OF PART C OF THE SDWA (PROTECTION OF UNDERGROUND SOURCES OF DRINKING WATER) TO INDIAN LANDS

■ Phillips first challenges the regulation in question by arguing that the EPA had no jurisdiction over Indian lands.[10] Brief for Petitioners at 14. Before examining that position, we note that this issue

---

**9.** Even though the review provisions in question are framed in jurisdictional terms, they are in fact procedural and more related to venue than fundamental grants of subject matter jurisdiction. Thus, our authority to review a previously filed petition is even more manifest.

Finally, Phillips is probably correct in its contention that when the EPA acted to define its own authority, 40 C.F.R. § 144.2, it went beyond section 1421. In doing so, it derived power from the general authorization provision of the SDWA contained in section 1450. As to any action of the Administrator under that section, judicial review would always have been in this circuit. Sec-

tion 1448(a)(2), 42 U.S.C. § 300j-7(a)(2). Therefore, we have had authority to review at least part of the EPA's action from the outset.

**10.** Issues relating to the application of environmental protection laws to Indian lands have generated considerable discussion. *See generally* F. Cohen, *Handbook of Federal Indian Law*, 282–86 (1982); *see also* Will, *Indian Lands Environment—Who Should Protect It*, 18 Nat. Resources J. 465, 485–86 (1978); Petros, *The Applicability of the Federal Pollution Acts to Indian Reservation: A Case for Tribal Self-Government*, 48 U.Colo.L.Rev. 63 (1976).

cannot recur and in the future will be no more than a historical curiosity, probably confined to this case. The 1986 amendments to the SDWA resolve any doubt concerning coverage of the SDWA by expressly including Indian tribes. Pub.L. No. 99–339, § 302, 100 Stat. 665–66.

We must also address the EPA's strenuous arguments that Phillips is foreclosed from asserting its jurisdictional challenge. The EPA makes two points: (a) Phillips did not first raise the issue before the agency as is normally required with respect to objections to proceedings of an administrative agency, *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Unemployment Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *Wilson v. Hodel,* 758 F.2d 1369, 1373 (10th Cir.1985); *accord NLRB v. Thompson Transport Co.,* 406 F.2d 698, 701–02 (10th Cir.1969); *Garvey v. Freeman,* 397 F.2d 600, 611 (10th Cir.1968); and, (b) Phillips' challenge is untimely because it was not brought within 45 days after the EPA promulgated 40 C.F.R. § 144.2, a general regulation articulating its jurisdiction over Indian lands. Section 1448(a), 42 U.S.C. § 300j–7(a); *see generally American Association of Meat Processors v. Costle,* 556 F.2d 875, 876–77 (8th Cir.1977) (Federal Water Pollution Control Act); *Lloyd A. Fry Roofing Co. v. EPA,* 554 F.2d 885, 892–93 (8th Cir.1977) (Clean Air Act); *Granite City Steel Co. v. EPA,* 501 F.2d 925, 926–28 (7th Cir.1974) (Clean Air Act); *cf. Selco Supply Co. v. EPA,* 632 F.2d 863 (10th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981).

As the EPA points out, Phillips is raising the jurisdictional issue for the first time in its petition for review of the agency's action. Such belated timing is unfortunate. Phillips has both known of and participated in the EPA's rulemaking process with respect to Indian lands for a number of years without once challenging the agency's jurisdiction. Doing so now appears to be little more than an afterthought. It is a disservice to the agency, other affected parties, and to an orderly rulemaking process to thus omit or delay such fundamental challenges, even if legally permissible.

However, we cannot overlook an issue of jurisdiction as basic as that asserted here. If the SDWA did not apply in relevant part to Indian lands when the EPA attempted to assume and exercise jurisdiction under the SDWA, we would take notice of that jurisdictional defect on our own initiative. Accordingly, we entertain the question of the reach of the statute. We do so in the exercise of our own discretion, in the interest of judicial economy, and to put the matter to rest in the context of this limited time period. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *United States v. Cheama,* 783 F.2d 165 (10th Cir.1986); *Pell v. Azar Nut Co.,* 711 F.2d 949 (10th Cir.1983); *Gomes v. Williams,* 420 F.2d 1364 (10th Cir.1970). It may be that Phillips' legal arguments in favor of its right to bring up the issue at this late date also have merit. But in view of the exercise of our own discretion in the matter we do not find it necessary to explore in depth the positions of either party on the timeliness of the jurisdictional issue.[11]

The nub of Phillips' jurisdiction argument is that the EPA can only regulate under Part C of the SDWA where state governments can, but fail to do so. All parties agree that the Oklahoma state government has no power to prescribe an underground injection control program regulating the Osage Indian Reserve. Therefore, Phillips argues, the EPA has no power either. The matter is supposedly left by Congress to the Bureau of Indian Affairs.

---

11. We do note, however, that the EPA unsuccessfully raised similar arguments in *Washington, Dept. of Ecology v. E.P.A.,* 752 F.2d 1465, 1468–69 (9th Cir.1985). For the reason that prior actions related to matters too general to act as a bar to Phillips' petition here, we also reject the EPA's argument that Phillips is barred by provisions of a settlement agreement in another action, dated September, 1981.

Phillips develops its position as follows. The EPA grant of authority to prescribe underground injection control programs is codified as subsection (c) of section 1422, 42 U.S.C. § 300h–1(c), which provides:

> (c) If the Administrator disapproves a State's program (or part thereof) under subsection (b)(2) of this section, if the Administrator determines under subsection (b)(3) of this section that a State no longer meets the requirements of clause (i) or (ii) of subsection (b)(1)(A) of this section, or if a State fails to submit an application or notice before the date of expiration of the period specified in subsection (b)(1) of this section, the Administrator shall by regulation within 90 days after the date of such disapproval, determination, or expiration (as the case may be) prescribe (and may from time to time by regulation revise) a program applicable to such State meeting the requirements of section 300(h)(b) of this title.

As set forth in subsection (c), when a "State" fails to implement or maintain a program as required, then, and only then, the EPA shall prescribe a program *"applicable to such State."* (emphasis added). Section 1422, 42 U.S.C. § 300h–1(a), requires that the Administrator of the EPA list the states subject to the SDWA. Oklahoma was listed. No Indian tribe or land was listed.

A major underlying premise of Phillips' argument is that Part C of the SDWA refers only to states as sovereign political entities—not geographic areas. There is much to support that premise. "State" is always capitalized in the SDWA, and appears as a noun. Sections 1421 and 1422 of the SDWA, 42 U.S.C. §§ 300h and 300h–1, concentrate on actions by state government entities (adoption and implementation of programs, issuance of permits, prohibitions, authorizations, inspections, monitoring, recordkeeping, reporting, and so on). State is defined by the SDWA, insofar as pertinent here, as referring only to "the several States." Section 1401, 42 U.S.C. § 300f(13).

Phillips thus concludes that a literal reading of the statute shows it does not and cannot invest the EPA with jurisdiction over the Osage Mineral Reserve, or any other Indian land, reservation or tribe which is not under the jurisdiction of a state government. From a technician's standpoint the argument is a strong one. The statute clearly reflects congressional concern with the state-federal partnership. It shows that the drafters did not expressly address the questions of Indian lands or Indian sovereignty, but were concentrating on the major thrust of the SDWA. The question is whether the argument is so strong that it absolutely precludes any interpretation of the statute which would allow it to apply to Indian lands; so strong that it compels the conclusion that the SDWA did not cover vast areas of the United States, until amended in 1986.

We are not persuaded by Phillips. Its view of the statute is too narrow. Considering the amount of oil and gas exploration and production on Indian lands from 1974 to 1986, the SDWA would be eviscerated in large part by Phillips' interpretation. The statute is sufficiently ambiguous on its face to permit us to explore and apply congressional intent, search for national policy, and be guided by general legal precepts relating to Indian tribes and lands.

> Where the words are ambiguous the judiciary may properly use the legislative history to reach a conclusion. And that method of determining congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute. (citations omitted).

*United States v. Public Utilities Commission,* 345 U.S. 295, 315, 73 S.Ct. 706, 717–18, 97 L.Ed. 1020 (1953); *see also Lindahl v. Office of Personnel Management,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985). It is readily apparent from the legislative history that the underground drinking water provisions of the SDWA apply throughout the country, border to border, ocean to ocean. It is triggered by area (state) designations by the Administrator, but its reach covers the country.

Ambiguity in the statute appears in several ways. The definitions section of the SDWA refers directly to Indian tribal organizations in defining "municipality." Section 1401, 42 U.S.C. § 300f. In turn, the definition of "person" includes "municipality" Section 1401(12), 42 U.S.C. § 300f(12). Both sections 1421 and 1422 of the SDWA, 42 U.S.C. § 300h and § 300h-1, contain provisions relating to "persons." Thus, for example, section 1421(b)(1)(D)(ii) provides that a State program shall apply *"to underground injections by any other person* whether or not occurring on property owned or leased by the United States." Section 1421(b)(1)(D), 42 U.S.C. § 300h(b)(1)(D) (emphasis added). Section 1421(d)(2), 42 U.S.C. § 300h(d)(2) provides:

(2) Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply *any* public water system of any contaminant, and if the presence of such contaminant may result in such system's not complying with *any* national primary drinking water regulation or may otherwise adversely affect *the health of persons.*

(emphasis added).[12] Section 1445, 42 U.S.C. § 300j-4, authorizes inspection of the premises of "any supplier of water or other person" subject to criteria sufficiently broad to include Indian lands.

In addition, various parts of the statute can fairly be interpreted to mean that the term State (even though capitalized) refers to a geographic area, not necessarily a political entity. In section 1422(c), 42 U.S.C. § 300h-1(c), where the EPA is given the power to act, the statute states that an EPA prescribed program "shall apply *in* such State to the extent that a program adopted *by* such State which the Administrator determines meets such requirements *is not in effect."* (emphasis added). Finally, sections 1421(b)(3)(A) and (c), 42 U.S.C. § 300h(b)(3)(A) and (c), provide:

(3)(A) The regulations of the Administrator under this section shall permit or provide for consideration of varying geologic, hydrological, or historical conditions *in* different States and in *different areas within a State.*

· · · · ·

(C) Nothing in this section shall be construed to alter or affect the duty to assure that underground sources of drinking water will not be endangered by *any* underground injection.

(emphasis added).[13]

We now examine congressional intent as an aid to interpreting the statute. That intent is so clearly expressed in legislative history and so strong that it is dispositive of the issue of the statute's reach. When "interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the *objects and policy* of the law, as indicated by its various provisions, *and give to it such a construction as will carry into execution the will of the Legislature."* Kakoszka v. Belford, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974) (quoting *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857) (emphasis added). Similarly, the Supreme Court has recognized that statutes must be interpreted "not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed." *District of Columbia v. Carter,* 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973) (quoting *Puerto Rico v. Shell Co.,* 302 U.S. 253, 258, 58 S.Ct. 167, 169-70, 82 L.Ed. 235 (1937).

---

**12.** Phillips acknowledges that the public water systems portion of the SDWA (Part B), referred to in section 1421(d)(2), does apply to Indian tribes and lands. Reply Brief for Petitioner at 9-10.

**13.** The statutory definition of States as "the several States," section 1401(13), 42 U.S.C. § 300f(13), does not rule out the ordinary concept of a geographic area with prescribed borders. Maps of the United States show States by their familiar boundaries.

The SDWA was passed in 1974. The accompanying report from the House Committee on Interstate and Foreign commerce stated: "[T]he purpose of the legislation is to assure that the water supply systems serving the public meet minimum *national* standards for protection of *public* health," H.R.Rep. No. 1185, 93d Cong., 2nd Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 6454 (emphasis added), and Congress "anticipated that this list [of areas needing UIC programs] ... would include all 50 states," *Id.* at 32. "Until relatively recently," the report observes, "the fundamental elements of life—clean air to breathe, safe water to drink—have been taken for granted in the United States." *Id.* at 4. The report proceeds in the most express terms to state "[t]hat the causes and effects of unhealthy drinking water are national in scope," as evidenced by the spread of water-borne diseases, contagious and otherwise; and adverse impact on interstate commerce, travel, productivity, and other factors limiting the national economy. *Id.* at 8. Then the obvious but most significant point is made by the Committee:

> Other factors also illustrate the need for *national* concern about unsafe drinking water. Underground drinking sources which carry contaminants *may cross State boundaries.* In general, *water in the hydrologic cycle does not respect State borders.*

*Id.* (emphasis added). Therein lies the difference between Phillips' view of this legislation, and that of Congress. Phillips interprets the statute by emphasizing borders (state political entity versus Indian land). Congress emphasizes a national policy of clean water. So, therefore, must we in interpreting the statute.

In other contexts, the Supreme Court has recognized the existence of national policy in legislative acts. *Bob Jones University v. United States,* 461 U.S. 574, 593, 103 S.Ct. 2017, 2029, 76 L.Ed.2d 157 (1983) ("Over the past quarter of a century, every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination in public education."); *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 735, 101 S.Ct. 1437, 1441–42, 67 L.Ed.2d 641 (1981) ("The national policy favoring collective bargaining and industrial self-government was just expressed in the National Labor Relations Act of 1935, 29 U.S.C. § 151, *et seq.* It received further expression and definition in the Labor Management Relations Act, 1947, 29 U.S.C. § 141, *et seq.*") (the Taft-Hartley Act); *Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 660, 97 S.Ct. 2881, 2902, 53 L.Ed.2d 1009 (1977) (discussing "overriding expressions of national policy embodied in statutes like the Ku Klux Klan Act of 1871 or the Sherman Act of 1890"); *see also Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 217, 82 S.Ct. 1328, 1340–41, 8 L.Ed.2d 440 (1962) (discussing the Norris-Laguardia Act as "one of several statutes which, taken together, shape the national labor policy.")

Finally, in adopting the SDWA, Congress expressly stated its concern that Indians should enjoy the benefits of clean drinking water as should all Americans, noting that:

> The Indian Health Service ... operates a direct construction program to provide sanitation facilities to Indian and Alaskan natives. However, in the Committee's view these grant programs to construct drinking water supply systems are not necessarily adequate to assure that safe drinking water will be available [to Indians], even from those systems which are constructed with such aid.

H.R.Rep. No. 1185, 93d Cong., 2d Sess. at 9, U.S.Code Cong. & Admin.News 1974, p. 6462.

We conclude, therefore, that there is no sound policy reason to exclude Indian lands from the SDWA's application, and every reason to include them. As indicated above, the SDWA clearly establishes national policy with respect to clean water, including sources of underground water. To hold, as Phillips suggests, that the EPA did not have authority to promulgate un-

derground injection control programs for Indian lands would contradict the clear meaning and purpose of the SDWA by creating, prior to 1986, a vacuum of authority over underground injections on Indian lands, leaving vast areas of the nation devoid of protection from groundwater contamination. Indeed, it is a well established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute. *Bob Jones University*, 461 U.S. at 586, 103 S.Ct. at 2025.

The conclusion that the SDWA empowered the EPA to prescribe regulations for Indian lands is also consistent with the presumption that Congress intends a general statute applying to all persons to include Indians and their property interests.

*See Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 116–18, 80 S.Ct. 543, 553–55, 4 L.Ed.2d 584 (1960).[14] Although this rule of construction can be rescinded where a tribe raises a specific right under a treaty or statute which is in conflict with the general law to be applied, *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Donovan v. Navajo Forest Products Industries*, 692 F.2d 709 (10th Cir.1982); *United States v. White*, 508 F.2d 453 (8th Cir.1974), no such right under statute or treaty has been demonstrated. To the contrary, the Osage Indian Tribe supports the EPA's adoption of the injection program on the reserve. Doc. E–1084 (1980 Tribal Council resolution supporting the EPA's implementation of the program); Doc. D–1572 at 17–18 (Chief of Osage Tribe at June 1984 hearing supporting protection of groundwater by EPA).[15]

---

**14.** This general principle has been used to apply general statutes to Indian lands in many situations. This circuit has held that the National Environmental Policy Act ("NEPA") applies to federal decisions on Indian lands. In *Davis v. Morton*, 469 F.2d 593, 597 (10th Cir.1972), we held that "[t]he fact Indian lands are held in trust does not take it out of NEPA jurisdiction. *Id.* at 597 (citing *Tuscarora*). In *Manygoats v. Kleppe*, 558 F.2d 556 (10th Cir.1977), we noted that NEPA is designed to address national environmental interests, and while tribal interests may not coincide with national inerests, we could find "nothing in NEPA which exempts Indian lands from national policy." *Id.* at 599. In *Tuscarora*, the Supreme Court held that the general authority of the Federal Power Commission includes the power to condemn nontreaty Indian lands. *See also Choteau v. Burnet*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931) (general revenue laws apply to reservation Indians); *Navajo Tribe v. NLRB*, 288 F.2d 162 (D.C. Cir.), *cert. denied*, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 387 (1961) (NLRB can hold elections on the reservation even if the tribe opposes them).

More on point, the United States Court of Appeals for the Ninth Circuit has held that the Resource Conservation and Recovery Act of 1976 ("RCRA"), section 1002 et seq.; 42 U.S.C. § 6901 et seq. (1976), empowers the EPA to implement "state hazardous waste programs" on Indian lands. *Washington*, 752 F.2d at 1472. Like the SDWA, the RCRA provides for a comprehensive federal-state scheme to regulate the disposal of hazardous waste. Similarly, RCRA does not direct-

ly address the problem of how to implement "state hazardous waste management programs" on Indian reservations. Yet, the *Washington* court recognized that Congress intended to create a comprehensive waste management scheme and did not intend to leave any lands, regardless of the jurisdictional control over those lands, unprotected. Thus, the court held:

> The absence of state enforcement power over reservation Indians, however, does not leave a vacuum in which hazardous wastes go unregulated. EPA remains responsible for ensuring that the federal standards are met on the reservations. Those standards are designed to protect human health and the environment. [citation omitted]. The state and its citizens will not be without protection.

*Id.*

**15.** We also find persuasive the long history of congressional involvement with the oil and gas affairs of the Osage Indians. At the time of Oklahoma statehood, Congress reserved the minerals including the oil and gas to the Osage Tribe. Act of June 28, 1906, Chap. 3572, 34 Stat. 540 (1906). Congress specifically provided for the leasing of oil and gas on the reserve by the Osage Tribal Council with the approval of the Secretary of the Interior upon such rules and regulations that the Secretary might prescribe. *Id.* at 543. Furthermore, the federal government has already imposed regulations for the reserve requiring that oil and gas operations be conducted "in a manner that will prevent pollution and the migration of oil, gas, saltwater or other substance from one stra-

Finally, we have taken into consideration the EPA's own interpretation of the statute. Soon after passage of the 1977 amendments to the Act, the EPA's general counsel ruled that the EPA has the authority to prescribe an underground injection program for the Osage Reserve. *See* Opinion of the General Counsel No. 78–2, Doc. E–1088. As stated previously, the EPA promulgated its regulation asserting jurisdiction over Indian lands under Part C of the SDWA. 48 Fed.Reg. 2,938 (January 21, 1983) (codified at 40 C.F.R. § 144.2). Appropriate deference is due to the agency's own interpretation of the statute. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Hoover & Bracken Energies, Inc. v. Dept. of Interior,* 723 F.2d 1488 (10th Cir.1983), *cert. denied,* 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). We accord that deference taking into account, however, that the agency's position was not adopted proximate in time to the passage of the SWDA in 1974. Additionally, we cannot abdicate our independent responsibility to pass on lawful interpretations of a statute, since "the courts are the final authorities on issues of statutory construction." *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935–36, 19 L.Ed.2d 1090 (1968).

Phillips urges that no vacuum of statutory coverage existed under its theory because Congress intended the Bureau of Indian Affairs to control pollution on Indian lands. The 1986 amendments to the SDWA foreclose further debate on that point. In any event, Phillip's argument makes no sense. Two federal agencies regulating side by side, one following the SDWA and the other its own ad hoc regulations, hardly reflects either congressional intent or the national policy embodied in the statute.

Phillips also suggests that since the 1986 amendments cover Indian tribes in detail for the first time, the SDWA could not previously have covered Indian lands. It mounts a similar argument with respect to language in the 1977 amendments that existing Indian sovereignty over both land and water rights would not be affected.[16] We reject both arguments. The 1986 amendments provide detailed guidance as to the mechanics and application of the SDWA where Indian *tribes* are concerned. Tribes are included for the first time. But the amendments do not confer EPA jurisdiction over Indian lands themselves for the first time. "Statutes may be passed purely to make what was intended all along even more unmistakably clear." *United States v. Montgomery County, Maryland,* 761 F.2d 998, 1003 (4th Cir.1985). As the Sixth Circuit has also expressed, an amendment to an existing statute is not an acknowledgement by Congress that the original statute is invalid. It is a common and

tum to another, including any freshwater bearing formation." 25 C.F.R. § 226.22 (1986). While these actions were not undertaken pursuant to the SDWA, we nonetheless find them supportive of a continuing intent by Congress to exercise its jurisdiction over the oil and gas affairs of the Osage Indian Tribe.

16. Congress explicitly limited the jurisdiction of state governments over Indian lands. Section 8 of the 1977 Amendments to the SDWA, Pub.L. No. 95–190, 91 Stat. 1393, 1396–97 (1977), *codified at* section 1447, 42 U.S.C. § 300j–6, states:
(c)(1) Nothing in the Safe Drinking Water Amendments of 1977 shall be construed to alter or affect the status of American Indian lands or water rights nor to waive sovereignty over Indian lands guaranteed by treaty or statute.

(2) For the purpose of this chapter, the term "Federal agency" shall not be construed to refer to or include any American Indian tribe, nor to the Secretary of the Interior in his capacity as trustee of Indian Lands.

Section 1447(c) was enacted largely due to concern expressed by the Osage tribe that section 8 of the 1977 amendments, without this provision, would give jurisdiction over Indian lands to the State of Oklahoma. *See* Opinion of the General Counsel No. 78–2, Doc. E–1088. By concluding that Indian tribes are not "Federal agencies," Congress precluded any arguments that Indian tribes could be subject to state substantive and procedural laws through the provisions of the SDWA that require federal agencies to adhere to the oil and gas regulations of the state government.

customary legislative procedure to enact amendments strengthening and clarifying existing laws. *United States v. Tapert*, 625 F.2d 111, 121 (6th Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980), *cert. denied sub nom.* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). Legislative history concerning the 1986 amendments is silent on the question of EPA jurisdiction over Indian lands under the 1974 SDWA. To the extent any meaning can be inferred from that silence it supports our conclusion. If the 1986 amendments were intended to vest jurisdiction in the EPA, pursuant to Part C of the SDWA, over Indian lands for the first time, surely an explanation or comment would have been contained in the committee reports. *See Brown v. Marquette Savings & Loan Association*, 686 F.2d 608, 615 (7th Cir. 1982) ("We are persuaded ... by the absence of any indication of intent to change the law in the legislative history of the 1980 Act, that a change in the law was not intended by the addition of section 1640(d)").[17]

## IV.

### THE OSAGE REGULATION

#### A. *Standard of Review.*

We examine Phillips' contentions regarding the Osage regulation pursuant to established standards of review. The arbitrary and capricious standard of review provided by section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1977), applies to informal rulemaking proceedings such as those provided in the SDWA. *American Mining Congress v. Marshall*, 671 F.2d 1251, 1255 (10th Cir.1982). The United States Supreme Court has explained the arbitrary and capricious standard as follows:

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into

the facts is to be searching and careful, the ultimate standard is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted). In reviewing the Osage regulation, we must be aware that Congress delegated broad authority to the Administrator. Because Congress has conferred such sweeping authority on the Administrator, courts afford considerable deference to the EPA's construction of the statutory scheme that it is entrusted to administer. *See Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *Chevron v. Natural Resources Defenses Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1415 (10th Cir.1984); *Hoover and Bracken Energies*, 723 F.2d at 1489; *American Mining Congress*, 671 F.2d at 1255. We need not find that the EPA's interpretation is the only permissible construction but only that the EPA's understanding of the statute is a sufficiently rational one to preclude a court from substituting its judgment for that of the EPA. *See Chemical Manufacturers*, 105 S.Ct. at 1108. "The need for judicial restraint is further heightened by the realization that courts do not share the [Administrator's] expertise in this highly technical area." *American Mining Congress*, 671 F.2d at 1255.

#### B. *Extension of Comment Period.*

■ Phillips argues that the Administrator acted arbitrarily and capriciously in refusing to extend the 45 day Osage regulation comment period 30 days. Phillips further contends that the EPA's refusal to extend the comment period deprived them of the opportunity to fully develop a record before the agency. We find those arguments to be without merit.

---

**17.** Following oral argument in this case, both sides were granted full opportunity to submit their views on the effect, if any, of the 1986 Amendments to the SDWA. We have fully considered those views.

The SDWA provides for an informal rule-making process when the EPA promulgates rules under statutory authority.[18] Section 1421(a)(2), 42 U.S.C. § 300h(a)(2). As mentioned, the procedures necessary in informal rulemaking are set forth in § 553 of the APA. 5 U.S.C. § 553 (1982). The agency must provide notice of the proposed rulemaking, and "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). This opportunity to participate is all that the APA requires. There is no requirement concerning how many days the EPA must allow for comment or that the EPA must re-open the comment period at the request of one of the participants. "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties.'" *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978) (quoting *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467–68, 14 L.Ed.2d 383 (1965)). "Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed." *Vermont Yankee,* 435 U.S. at 546, 98 S.Ct. at 1213 (emphasis in original). To impose upon the agency more stringent procedural requirements, absent extraordinary circumstances, would clearly violate the Supreme Court's holding in *Vermont Yankee* that the formulation of procedure is to be basically left within the discretion of the agencies to which Congress has confined the responsibility for substantive judgments. *Id.* at 524, 98 S.Ct. at 1202.

It is evident to us that Phillips was given a full and fair opportunity to comment on all significant issues in the rulemaking proceeding. The EPA informed Phillips of its intent to adopt an underground injection control program for the Osage Mineral Reserve in 1980, four years prior to the actual proposal of the Osage program. Doc. E–1078. The EPA sent Phillips a draft of the Osage program, and met with Phillips to discuss that draft, in December 1982, almost one and a half years prior to the agency's formal publication of the rule in the *Federal Register. See* Fed.Reg. 20,238 (May 11, 1984); *see also* Doc. E–1048. The EPA also held a public hearing in October 1983, on the Indian lands program for Oklahoma. *See* 48 Fed.Reg. 40,098–99 (Sept. 2, 1983). The EPA formally proposed the Osage rule in May 1984. *See* 49 Fed.Reg. 20, 238 (May 11, 1984). The EPA held a public hearing on the Osage program on June 14, 1984, at which Phillips actively participated. Doc. E–1572. Phillips also commented in detail on the proposed rule. Doc. D–1013.

We further note that Phillips has presented no evidence that they were prejudiced by the EPA's refusal to extend the comment period. Nor does the record indicate that the 45 day comment period was inherently short or inadequate. Courts have uniformly upheld comment periods of 45 days or less. *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 534 (D.C. Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (denying petitioner's claim that a 30 day comment period was unreasonable, notwithstanding petitioner's complaint that the rule was a novel proposition); *North American Van Lines v. ICC,* 666 F.2d 1087, 1092 (7th Cir.1981) (claim that 45 day comment period was insufficient rejected as "without merit.") The administrative record demonstrates that Phillips was consistently involved from 1980 to the promulgation of the Osage rule in final form, and that it had ample opportunity to comment. We cannot find that the EPA's refusal to extend the comment period 30 days is arbitrary, capricious or an abuse of discretion.

### C. *EPA's Mechanical Integrity Test.*

■ Phillips next asks us to review the mechanical integrity requirement of the Os-

---

**18.** The SDWA also provides the additional requirement of a public hearing. *See* sections 1421(a)(2) and 1422(c), 42 U.S.C. §§ 300h(a)(2), 300h–1(c).

age rule. Under the mechanical integrity test, every well is required to demonstrate mechanical integrity by successful completion of an annulus pressure test which demonstrates that there is not a significant leak in the casing, tubing, or packer.[19] 40 C.F.R. § 147.2912 (1985). Phillips maintains that the no significant leak rule violates the SDWA's requirement that an underground injection program may not "interfere with or impede" the underground injection of brine in natural gas production or any underground injection for the enhanced recovery of oil, "unless such requirements are essential to assure that underground sources of drinking water will not be endangered by such injection." Section 1422(c), 42 U.S.C. § 300h–1(c).[20] The thrust of Phillips' argument is that there are a number of old injection wells on the Osage Mineral Reserve with casings of questionable integrity, but which pose no threat to underground drinking water sources since they are being operated in accordance with Bureau of Indian Affairs ("BIA") requirements that require the installation of injection tubing set on a packer. Brief for Petitioners at 3. The cost of installing new cement casings or performing cement squeeze jobs, Phillips alleges, may cause many marginally producing wells to be shut down. *Id.*

The principle basis for rejecting Phillips' argument is the wording of the statute. Section 1422(c), 42 U.S.C. § 300h–1(c), directs the EPA to guard against the contamination of underground sources of drinking water. If a requirement "is essential to assure that underground sources of drinking water will not be endangered," then it is of no import whether underground injections are impeded. *Id.* Indeed, the clear overriding concern of Congress was that of "assuring the safety of present and potential sources of drinking water." H.R.Report No. 1185, 93d Cong., 2d Sess. at 31, U.S.Code Cong. & Admin.News 1974, p. 6484. Section 1422(c), 42 U.S.C. § 300h–1(c), was not intended "to require ... EPA to bear an impossible burden of proof as a condition of promulgation of any such regulation." *Id.* Moreover, the phrase " 'underground injection which endangers drinking water sources' is to be liberally construed so as to effectuate the preventative and public health protective purposes of the [SDWA]." H.R.Rep. No. 1185, 93d Cong., 2d Sess. 32 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6484.[21]

We simply cannot conclude that the EPA's mechanical integrity requirement violates the strictures of the SDWA. The EPA, in its expert judgment, concluded af-

---

**19.** The no significant leak requirement of the mechanical integrity test ("MIT") requirement was first adopted by the EPA as a national technical minimum requirement rule for underground injection control programs. 45 Fed. Reg. 42,473, 42,481, 42,505 (June 24, 1980) (codified at 40 C.F.R. § 146.08 (1984). This rule requires that operators demonstrate the absence of a "significant leak" in their tubing, casing, and packer. *Id.* The EPA ultimately adopted the annulus pressure test in the national rules. *See,* 40 C.F.R. § 146.08, § 147.-2912(a).

The EPA also adopted the mechanical integrity test requirement for the Osage program. *See* 49 Fed.Reg. 45,292, 45,312 (Nov. 15, 1984) (codified at 40 C.F.R. § 147.-2912(a)(1)(i) and (ii). The Osage rule required that all "wells must demonstrate that there is no significant leak in the casing, tubing, and packer." *Id.* Based on this requirement, the EPA decided to consider no options that would allow "wells to operate [in Osage] if there are significant leaks in the casing." 49 Fed.Reg. at 45,303.

**20.** Section 1422(c), 42 U.S.C. § 300h–1(c), provides that "[s]uch program may not include requirements which interfere with or impede—

(1) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production, or

(2) any underground injection for secondary or tertiary recovery of oil or natural gas, *unless such requirements are essential to assure that underground sources of drinking water will not be endangered by such injection.* (emphasis added).

**21.** The SDWA itself expressly emphasizes that "nothing in this section [1421] shall be construed to alter or affect the duty to assure that underground sources of drinking water will not be endangered by any underground injection." Section 1421, 42 U.S.C. § 300h(b)(3)(C).

ter extensive and detailed studies that the protection of a cement casing with mechanical integrity is essential to protect underground sources of drinking water. Docs. D–1532, E–1035, E–1064; *see also* Fed.Reg. 45,292, 45,303 (November 15, 1985).[22] Phillips, in essence, asks this court to substitute its judgment for that of the Administrator, although there is substantial evidence to justify the Administrator's conclusion that the mechanical integrity test is essential to protect underground sources of drinking water. This we cannot do. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24.

Phillips has also failed to produce any demonstrable evidence that the "no significant leak" requirement interferes with or impedes oil production. The legislative history suggests that absent a "prior showing" that a rule "stop[s] or substantially delay[s]" oil production, no inquiry need be made into whether the rule is "essential" to protection of underground sources of drinking water. H.R.Rep. No. 1185, 93d Cong., 2d Sess. at 31, U.S.Code Cong. & Admin.News 1974, p. 6484. In using the words "interefere with or impede," Congress "did not intend to include every regulatory requirement which would necessitate the expenditure of time, money, or effort." H.R.Rep. No. 1185, 93d Cong., 2d Sess. at 31, U.S.Code Cong. & Admin.News 1974, p. 6484. Rather, the Committee intended to refer to those requirements which could stop or substantially delay production of oil or natural gas. *Id.* Phillips, however, has produced no such evidence. To the contrary, even after repeated requests by the EPA for input and data regarding the effect of the mechanical integrity requirement, Docs. E–1073, E–1078, E–1048, Phil-

lips produced no demonstrable support for its proposition. As such, Phillips cannot attack the Administrator's conclusion, that while some costs and production losses were likely, no substantial impediment to oil and gas production would result from implementation of the mechanical integrity requirements. *See* 45 Fed.Reg. 42,472, 42,-487–500 (June 24, 1980).

## D. Consideration of Geologic, Hydrological, or Historical Conditions.

Phillips also argues that the Osage mechanical integrity test violates Section 1421's mandate that "regulations ... under this section shall permit or provide for consideration of varying geologic, hydrological, or historical conditions in different States and in different areas within a State." Section 1421(b)(3)(A), 42 U.S.C. § 300h(b)(3)(A). Phillips suggests that the EPA did not consider these factors because it dismissed Phillips' evidence of "the very large number of very old injection wells [on the Osage reserve] with questionable integrity." Brief of Petitioners at 24.

Phillips misinterprets the import of Section 1421(b)(3)(A). Section 1421(b)(3)(A) was intended to insure that national rules would be sufficiently flexible to allow for consideration of local factors. It was not intended to allow increased risk or endangerment of underground sources of drinking water. H.R. No. 338, 95th Cong., 1st Sess. at 9 (1977). The provision should not be interpreted as "requiring the Administrator to subordinate the concern for protection of underground water sources to that of energy production." H.R.Rep. No. 338, 95th Cong., 1st Sess. at 10.

The Record is replete with evidence that the EPA considered the local geologic, hy-

---

**22.** The agency found that casing is an important protection of underground drinking water contamination in the event of a cement, tubing, or packer failure. Docs. D–1532, E–1035. Corrosive materials, such as highly salty deep formation brine, may attack the tubing if the casing has holes. *Id.* Finally, the EPA determined that the casing tubing of a well with a corroded casing may serve as a conduit for movement of fluids from salty formations into underground sources of drinking water just as

an improper cementing outside the casing may allow such movement. *Id.; cf.* 49 Fed. Reg. 45,296 (Nov. 15, 1984). 49 Fed.Reg. 45,-296 states:

> improper cementing at the borehole through strata other than the injection zone could allow fluid to migrate from one formation to another, a situation that would have no effect on the enhanced recovery operation, but which could result in a significant contamination of a USDW.

drological, and historical conditions of the Osage reserve prior to the adoption of the Osage underground injection control program. Doc. E–1035 (analysis of injection well integrity); Doc. E–1064 (analysis of the types of wells used at the Osage reserve and of the underground sources of drinking water on the reserve); Doc. E–1034 (study regarding the prevention of contamination of underground drinking water); and Doc. E–1034 (inventory of the geology of the Osage reserve). The agency also considered tribal preferences, underground injection control programs of adjacent states, and the BIA requirements for the Osage reserve in drafting the final Osage rule. *See* 49 Fed.Reg. at 45,300–301 (Nov. 15, 1984). As such, we cannot say that the EPA abused its discretion.

### E. Case-By-Case Review.

▪ Finally, Phillips argues that the EPA unlawfully failed to include in the underground injection program a mechanism for a case-by-case review of whether the mechanical integrity test would cause a loss of oil and gas production without being essential to insure that underground sources of drinking water will not be endangered. Phillips suggests that the regulation precludes any alternate mechanical integrity test that would permit a well to operate with holes in the casing although the tubing, packer, and cement job were sufficient to insure that contaminated fluid is not allowed to enter sources of drinking water.

Phillips' argument is simply a restatement of its earlier argument that the mechanical integrity test violates the SDWA's mandate that no regulations may adversely affect oil production unless essential to protect underground sources of drinking water. The EPA has made a determination that in the Osage reserve, a significant leak in the casing, tubing, or packer is per se an endangerment to the sources of drinking water underlying the Osage reserve. *See* 49 Fed.Reg. at 45,303 (Nov. 15, 1984). In its expert judgment, the EPA "decided to consider no options which would allow wells to operate if there are significant leaks in the casing." *Id.*

Therefore, the EPA concluded that the prevention of substantial leaks is essential to assure the protection of underground sources of drinking water.

Phillips now suggests, however, that it should be permitted to contest the necessity of the mechanical integrity test on a case-by-case basis, even though the EPA has already determined that the mechanical integrity test is essential. We have already determined that the EPA's decision to adopt the mechanical integrity test was not arbitrary or capricious and we need not redirect our attention to that issue here.

There are approximately 3,600 injection wells in Osage County. About 1,250 of those wells utilize salt water disposal techniques, while the other 2,350 are enhanced recovery wells. Doc. D–1572 at 10–11. To require the EPA to undertake a case-by-case determination of whether the mechanical integrity test should apply for each well would severely handicap the implementation of the act the EPA was entrusted by Congress to administer. The EPA was well within its discretion to utilize a generic streamlined approach or procedure "where the conventional course, typically case-by-case determinations, would, as a practical matter, prevent the agency from carrying out the mission assigned to it by Congress." *Alabama Power Co. v. Costle*, 636 F.2d 323, 358 (D.C.Cir.1979). As the Supreme Court has recognized, " 'considerations of feasibility and practicality are certainly germane' to the issues before us. *Bowles v. Willingham*, [321 U.S. 503, 517, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944) ].... We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purpose for which it has acted." *Permian Basin Area Rate Cases*, 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968); *accord E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 132, 97 S.Ct. 965, 977, 51 L.Ed.2d 204 (1977); *Environmental Defense Fund v. EPA*, 598 F.2d 62, 84–85 (D.C.Cir.1978). Furthermore, we note that the Osage rule does not prevent each well from receiving a case-by-case review if it has a significant leak. Moreover, the

Osage rule provides that alternate "[t]esting and monitoring programs [may be] approved by the Regional Administrator on a case-by-case basis" to demonstrate the absence of a significant leak. 40 C.F.R. § 147.2912(a)(1)(v).

## CONCLUSION

In summary, we hold that the EPA is empowered by the SDWA to implement underground injection control programs on Indian lands. We further hold that the EPA complied with all necessary procedural requirements in promulgating the Osage underground injection control program and that that program is within the statutory and regulatory guidelines of the SDWA. We have considered all of Phillips' arguments. To the extent they are not discussed, they are insufficiently meritorious for independent comment. The petition for review is dismissed.